### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

**(1) MEGAN FIEKER, individually and on behalf of all others similarly situated**

        **Plaintiff,**

**v.**

**(1) FISHER-PRICE, INC.; and MATTEL, INC.,**

        **Defendants.**

Case No. <u>19-cv-295-TCK-JFJ</u>

**JURY TRIAL DEMANDED**

### INTRODUCTION

1.      The Fisher-Price Rock 'n Play Sleeper ("Rock 'n Play Sleeper") is an inclined infant "sleeper" that Defendants, until April 12, 2019, marketed as suitable for all night or prolonged sleep. Defendants' marketing of this product as appropriate for prolonged sleep was intentional and overt. Not only is "Sleeper" in the name of the product, but the boxes in which the Rock 'n Play Sleepers were sold, and other materials used to promote them, prominently exclaim, "Baby can sleep at a comfortable incline all night long!" and make similar statements about its fitness for prolonged and nighttime sleep. This marketing was dangerously false and misleading, as the product is not safe for all-night or prolonged sleep for infants.

2.      The Rock 'n Play Sleeper is inherently unsafe as a sleeper and unfit for its intended use. Its use poses a number of serious safety risks that have led to many documented instances of infant deaths and injuries. By positioning an infant at a 30-degree incline, the Rock 'n Play Sleeper significantly increases the risk that the infant's head will slip into a dangerous position, tilt to constrict the windpipe and/or cause the infant's face to become pressed against the padded fabric

in the sleeper and block airflow, which the infant may be unable to correct. This increases the risk of death by asphyxiation. In addition, because Defendants advise parents to keep babies strapped in restraints overnight while sleeping on an incline, the Rock 'n Play Sleeper increases the infant's risk of developing flat head (plagiocephaly) and twisted neck (torticollis) syndromes, conditions that often require babies to wear expensive head-molding helmets and undergo physical therapy.

3.    Defendants knew about these risks for as long as they sold the Rock 'n Play Sleeper. Among other things, (1) the American Academy of Pediatrics ("AAP") and major consumer groups repeatedly issued warnings about the serious dangers of inclined sleepers; (2) due to these known dangers, regulators in Canada and Australia did not allow Defendants to sell the Rock 'n Play Sleeper in their countries as a "sleeper"; (3) Defendants have already been sued for at least one infant death in a Rock 'n Play Sleeper; (4) at least 32 deaths have occurred in babies using the Rock 'n Play Sleeper; and (5) upwards of 700 injuries have been reported due to the use of inclined sleepers, including the Rock 'n Play Sleeper. Ignoring documented safety concerns, Defendants marketed and sold the Rock 'n Play Sleeper in the United States as an infant sleeper that is suitable for all night and prolonged sleep.

4.    In fact, as set forth below, the Rock 'n Play Sleeper is so dangerous and has caused so many infant deaths, that, on April 12, 2019, Defendants, after making an incomplete disclosure on April 5, 2019, were forced to recall approximately 4.7 million Rock 'n Play Sleepers units in the United States.

5.    On April 5, 2019, the Consumer Product Safety Commission ("CPSC") and Fisher-Price issued a statement acknowledging that ten infants have died while in the Rock 'n Play Sleeper

since 2015, and warning consumers to stop using the Rock 'n Play Sleeper once the infant reaches

three months of age or as soon as the infant exhibits rollover capabilities.[1]

> The Consumer Product Safety Commission (CPSC) and Fisher-Price warn consumers about the Fisher-Price Rock 'n Play due to reports of death when infants roll over in the product.    According to medical literature, infants typically begin rollover behaviors at 3 months.  ***The CPSC is aware of 10 infant deaths in the Rock 'n Play that have occurred since 2015, after the infants rolled from their back to their stomach or side, while unrestrained. All 10 infants were 3 months or older.***
>
> ***Because deaths continue to occur, CPSC is recommending consumers stop use of the product by three months of age, or as soon as an infant exhibits rollover capabilities.***  CPSC has previously warned consumers to use restraints in infant inclined sleep products.
>
> Fisher-Price warns consumers to stop using the product when infants can roll over, but the reported deaths show that some consumers are still using the product when infants are capable of rolling and without using the three point harness restraint.
>
> CPSC and Fisher-Price remind consumers to create a safe sleep environment for infants, whether using a crib, bassinet, play yard, or inclined sleeper:  Never add blankets, pillows, stuffed toys, or other items to the environment and always place infants to sleep on their backs.
>
> The Commission voted to publish a finding that the health and safety of the public requires immediate notice. (Emphasis added).

6.    Mattel issued a press release later in the day on April 5, 2019,[2] shortly after the joint

CPSC/Fisher-Price announcement, which stated in relevant part:

---

[1] https://cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product (last visited May 28, 2019).

[2] https://news.mattel.com/news/media-statement-on-the-u-s-consumer-product-safety-commission-fisher-priceR-joint-security-alert-released-on-april-5-2019 (last visited May 28, 2019).

A child fatality is an unimaginable tragedy.

Fisher-Price has a long, proud tradition of ***prioritizing safety as the cornerstone of our mission***. Generations of parents have trusted us for almost 90 years to provide safe products for their children. We are there with you from the moment you bring your child home and take our responsibility for product safety very seriously.

Today, the Consumer Product Safety Commission (CPSC) and Fisher-Price have jointly issued an alert warning parents and caregivers to discontinue use of the Rock 'n Play Sleeper when infants begin to roll over. ***To ensure a safe sleep environment for infants, we remind parents and caregivers to follow all safety warnings included with the product: always use the provided restraints, always place infants on their backs to sleep, and make sure that no pillows, blankets or extra padding are placed in the Rock 'n Play Sleeper. The Rock 'n Play Sleeper meets all applicable safety standards***, including those of the international standards organization, known as ASTM International, and is certified by the Juvenile Products Manufacturers Association (JPMA).

Fisher-Price and every one of our employees take the responsibility of being part of your family seriously, and we are committed to earning that trust every day. (Emphasis added).

7.      Despite announcing that ten babies died from the use of Defendants' product and issuing a warning to consumers, Chuck Scothon, General Manager of Fisher-Price, separately stated on April 5, 2019, that the Rock 'n Play Sleeper meets all applicable safety standards.[3]

8.      On April 8, 2019, Consumer Reports published a lengthy article entitled Fisher-Price Rock 'n Play Sleeper Should be Recalled, Consumer Reports Says.[4] The article describes the results of Consumer Reports' investigation, which found the Rock 'n Play Sleeper is tied to at least 32 infant deaths. Consumer Reports noted that the Rock 'n Play Sleeper "has not been recalled by Fisher-Price, part of the children's products giant Mattel, which had about $4.5 billion in sales in 2018. The deaths prompted only warnings by the company and the CPSC, which does not have a

---

[3] https://www.cnn.com/2019/04/05/health/fisher-price-rock-n-play-sleeper-warning/index.html (last visited May 28, 2019).

[4] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited May 28, 2019).

mandatory safety standard for infant reclined sleep products." The article further notes that "the number of incidents associated with the Rock 'n Play Sleeper, combined with long-standing expert medical advice that babies should sleep on firm, flat surfaces, raises serious safety concerns about the product."

9.    On April 9, 2019, the AAP issued a press release calling on the CPSC to recall the Rock 'n Play Sleeper and urging parents to stop using the Rock 'n Play Sleepers immediately, stating in relevant part as follows:[5]

> AAP urges parents to stop using the product immediately. Stores should remove the Rock 'n Play Sleeper from their shelves. A warning issued by the CPSC and Fisher-Price on April 5 did not go far enough to ensure safety and protect infants, according to the AAP.
>
> "This product is deadly and should be recalled immediately," said Kyle Yasuda, MD, FAAP, president of the American Academy of Pediatrics. "When parents purchase a product for their baby or child, many assume that if it's being sold in a store, it must be safe to use. Tragically, that is not the case. There is convincing evidence that the Rock 'n Play inclined sleeper puts infants' lives at risk, and CPSC must step up and take immediate action to remove it from stores and prevent further tragedies."
>
> Last week, the CPSC and manufacturer alerted consumers to stop using the product when the infant reaches 3 months of age or is capable of rolling over, citing 10 infant deaths that occurred in the Rock 'n Play. The Consumer Reports article, published April 8, tied a total of 32 deaths to the Rock 'n Play, including the 10 noted in last week's warning.
>
> Consumer Reports concluded that these 32 deaths, between 2011 and 2018, included babies even younger than the 3-month threshold cited in the initial warning, which is alarming. The cause of death listed for some babies was asphyxia, or the inability to breathe caused by the babies' position. AAP urges parents of children of all ages to immediately stop using the Rock 'n Play.
>
> "We cannot put any more children's lives at risk by keeping these dangerous products on the shelves," said Rachel Moon, MD, FAAP, chair of the AAP Task Force on SIDS. "

---

[5] https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Urges-U-S-Consumer-Product-Safety-Commission-to-Recall-Fisher-Price-Rock-n-Play-Sleeper.aspx (last visited May 28, 2019).

The Rock 'n Play inclined sleeper should be removed from the market immediately. It does not meet the AAP's recommendations for a safe sleep environment for any baby
. Infants should always sleep on their back, on a separate, flat and firm sleep surface without any bumpers or bedding." (Emphasis added).

The AAP does not recommend inclined sleep products like the Rock 'n Play, or any other products for sleep that require restraining a baby. (Emphasis added).

10.     Finally, on April 12, 2019, after at least 32 infants died, hundreds more were injured, at least 4.7 million infants were exposed to risk of death, and years after the most respected association of pediatricians in the United States, as well as a multitude of other sources, warned them of the risk, Defendants were forced to recall all Rock 'n Play Sleepers (the "Recall").  The title of the Recall notice is, "Fisher-Price Recalls Rock 'n Play Sleepers Due to Reports of Deaths."[6]  The announcement states:

> *Infant fatalities have occurred in Rock 'n Play Sleepers, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances.*[7]

(Emphasis added).  It advises that "[c]onsumers should immediately stop using the product."

11.     The terms of the Recall are set forth on Mattel's website as follows:

> • If the Fisher-Price Rock 'n Play Sleeper was originally purchased new - either by you or by a prior owner of the product - on or after 10/12/2018, you will receive a full cash refund.  If you include your original receipt you will be reimbursed for the receipt amount including sales taxes paid.  If you do not have your receipt, please write the month and year of purchase on one of the hubs you are returning, and we will determine the refund amount for you.

---

[6] https://www.cpsc.gov/Recalls/2019/Fisher-Price-Recalls-Rock-n-Play-Sleepers-Due-to-Reports-of-Deaths (last visited May 28, 2019).

[7] Id.; see also https://service.mattel.com/us/recall/BJD57_ivr.asp (last visited May 28, 2019).

> • If the Fisher-Price Rock 'n Play Sleeper was originally purchased new - either by you or by a prior owner of the product - before 10/12/2018, you will receive a voucher for a Fisher-Price product to be selected from a list of products to be provided by Fisher-Price.  Your product choice will be determined by the original date of purchase of the product.  To establish your date of purchase, please send in your original receipt if you have it.  If you do not have your receipt, please write the month and year of your purchase on one of the hubs you are returning.8[8] (Emphasis in original).

12.    Despite voluntarily recalling the potentially deadly product on April 12, 2019, Chuck Scothon, general manager of Fisher-Price, again claimed that the product was safe, stating:

> We stand by the safety of our products. However, due to reported incidents in which the product was used contrary to the safety warnings and instructions, we have decided to conduct a voluntary recall of the Rock 'n Play Sleeper in partnership with the Consumer Product Safety Commission."[9]

13.    Significantly, while Defendants' April 5, 2019 press release disclosed that there were ten infant deaths in the Rock 'n Play Sleeper since 2015 and warned that the product should not be used for infants under three months, in the April 12, 2019 Recall, Defendants disclosed that more than 30 babies had died in the Rock 'n Play Sleeper since 2009 and directed consumers to stop using the product for their babies regardless of how old they were.

14.    After the Recall, consumer advocates expressed concern that the Recall program is too restrictive and will cause confusion.  A Washington Post article about the Recall quotes Rachel Weintraub, General Counsel of the Consumer Federation of America as stating that the Recall is "problematic."[10] It also quotes the Executive Director of Kids in Danger, Nancy Cowles, as expressing concern that the sliding scale of reimbursement under the Recall will "discourage

---

[8] https ://service.mattel.com/us/recall/BJD57_ivr.asp (last visited May 28, 2019)

[9] https://news.mattel.com/news/media-statement-on-the-fisher-priceR-rock-n-play-recall-notice-released-on-april-12-2019 (last visited May 28, 2019).

[10] https://www.washingtonpost.com/business/2019/04/12/after-reports-infant-deaths-nearly-million-fisher-price-rock-n-play-sleepers-recalled/?utm_term=.e67e806b8aeb&wpisrc=nl_rainbow&wpmm=1 (last visited May 28, 2019).

participation."[11] Indeed, among other things, the Recall unfairly limits full reimbursement to parents who have only owned the product for six months or less; for that category of customers, provides for reimbursement of tax only if they kept the receipt; and for parents who owned the product for six months or more, provides a voucher "for a Fisher-Price product to be selected from a list of products to be provided by Fisher Price," which "will be determined by the original date of purchase of the product."

15.     Consumer advocates also continued to express their outrage about the egregiousness of Defendants' wrongdoing.  An April 12, 2019, a press release by Consumer Reports quotes its President and CEO, Marta Tellado, as stating, "The Fisher-Price recall of the Rock n' Play is long overdue. *Fisher-Price* and the CPSC *knew about deaths linked to this product for years and could have taken steps to avoid this unnecessary tragedy*."[12]  (Emphasis added).  The press release also quotes William Wallace, Senior Policy Analyst for Consumer Reports, as stating, "While we are glad to see all Rock 'n Play Sleepers recalled, *Fisher-Price and its parent company Mattel misled parents and caregivers by marketing this product as safe for sleep, and they owe it to their customers to give them full refunds, rather than partial refunds or company vouchers. And that should be the case regardless of how long ago the product was bought*."[13] (Emphasis added).  As Consumer Reports recognizes, Defendants cannot attempt to whitewash their unconscionable wrongdoing by issuing the Recall.

16.     Had parents like Plaintiff Ms. Fieker been aware of the potentially fatal dangers posed by the Rock 'n Play Sleeper, or the serious risks of injury such as flat head and twisted neck syndrome, they would not have purchased and/or used the product. Defendants' false and

---

[11] Id.

[12] https://advocacy.consumerreports.org/press_release/consumer-reports-recall-of-fisher-price-rock-n-play-sleeper-long-overdue-welcome/ (last visited May 28, 2019).

[13] Id.

misleading marketing of this dangerous product, and knowing failure to disclose the grave risks of its use as a sleeper for overnight or prolonged sleep, allowed Defendants to reap vast profits at the expense of consumers who erroneously believed they were obtaining a safe place for their babies to sleep.

17.    In this egregious case of corporate greed run amok, Plaintiff, on behalf of herself and a class of owners of at least 4.7 million Rock 'n Play Sleepers, seeks damages and all other relief available under law and equity form Fisher-Price and its corporate parent Mattel, including punitive damages for their appalling and unconscionable misconduct.

## PARTIES

18.    Plaintiff Megan Fieker is a citizen of Tulsa County in the State of Oklahoma.  In or about 2014, she received as a gift or purchased a Rock 'n Play Sleeper to use as a "sleeper" for overnight or prolonged sleep for her infant. Ms. Fieker was induced to use the Rock 'n Play Sleeper by Defendants' marketing that it was a suitable environment for infants to sleep in for prolonged periods or overnight. Ms. Fieker, whom is currently pregnant with her second child, had planned to use the Rock 'n Play Sleeper with her second child until Defendants issued their voluntary recall.

19.    Defendant Fisher-Price, Inc. is a Delaware corporation with its principal place of business in East Aurora, Erie County, New York.  Defendant Fisher-Price manufactures and markets products for the care of infants and preschool children to consumers throughout the United States, including in the State of Oklahoma.

20.    Defendant Fisher-Price is a wholly-owned subsidiary of Defendant Mattel, Inc. The website on which Defendants advertised their Rock 'n Play Sleepers includes Mattel's name: https://fisher-price.mattel.com.

21.    Defendant Mattel, Inc. is a Delaware corporation with its principal place of business in El Segundo, California.  Defendant Mattel is the world's second largest toy maker and is the

corporate parent of Fisher-Price.  On its annual filings with the Securities Exchange Commission,

Mattel references Fisher-Price as a "brand" in "Mattel's portfolio of global brands."[14]

22.    Mattel, until April 12, 2019, directly and/or through Fisher-Price, designed,

marketed, distributed and sold Rock 'n Play Sleepers throughout the United States, including in

Oklahoma.

23.    Mattel shares overall responsibility for the safety of Fisher-Price products,

including the Rock 'n Play Sleeper.  All recall and safety alerts for both Fisher-Price and Mattel

products, as well as customer service for both Fisher-Price and Mattel products, are found on the

Mattel website.[15]

## JURISDICTION AND VENUE

24.    The Court has jurisdiction over Plaintiff's claims under the Class Action Fairness

Act ("CAFA"), 28 U.S.C. § 1332(d)(2) because there are 100 or more class members, at least one

class member is a citizen of a state that is diverse from each Defendant's citizenship, and the

amount in controversy exceeds $5 million exclusive of interest and costs.

25.    Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because

Plaintiff's claims under the Magnuson Moss Warranty Act, 15 U.S.C. § 2301, et seq., arise under

federal law, and this Court has supplemental jurisdiction over Plaintiff's state law claims under 28

U.S.C. § 1367.

26.    This Court has personal jurisdiction over Defendant Fisher-Price because it

purposefully availed itself of the privilege of conducting business in the State of Oklahoma;

because it transacts business, and supplies good and services in the State of Oklahoma; because  it

---

[14] See, e.g., Mattel, Inc., 2018 10-K, at 4 (February 22, 2019); Mattel, Inc., 2017 10-K, at 3
(February 27, 2018).

[15] https://service.mattel.com/us/recall.aspx (last visited May 28, 2019).

committed tortious acts that caused injury to persons within the State of Oklahoma; and because there is a substantial relationship between Plaintiff's claims and Oklahoma transactions involving Fisher-Price.

27.    The Court has personal jurisdiction over Defendant Mattel because it has purposefully availed itself of the privilege of conducting business in the State of Oklahoma, including that it is the owner of the Fisher-Price brand; because it transacts business, and supplies good and services in the State of Oklahoma; because it committed tortious acts that caused injury to persons within the State of Oklahoma; and because there is a substantial relationship between Plaintiff's claims and Oklahoma transactions involving Mattel.

28.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

**Overview**

29.    Inclined sleepers such as the Rock 'n Play Sleeper are sleeping products that are inclined upwards on one end to raise a baby's head and torso up to approximately 30 degrees.  As initially reported in a November 26, 2018 Wall Street Journal article entitled Infant Deaths Prompt Questions Over Safety of Inclined Sleepers, at least 30 infant deaths and more than 700 injuries associated with these inclined sleepers – including, predominantly, the Rock 'n Play Sleeper – have been reported to the Consumer Product Safety Commission ("CPSC") since 2005.[16] More

---

[16] Voight, H. Infant Deaths Prompt Questions Over Safety of Inclined Sleepers, Wall Street Journal, Nov. 26, 2018, at A-3; see also Voight, H., Infant Sleep Deaths in Focus in Fight over Role of Consumer Safety Agency, Wall Street Journal, Nov. 23, 2018, available at https://www.wsj.com/articles/infant-sleep-deaths-in-focus-in-fight-over-role-of-consumer-safety-agency-1542974400 (last visited May 28, 2019).

than half of these reported deaths have occurred since September 2016.[17] As Defendants belatedly acknowledged in the April 12, 2019 Recall notice, they are aware that at least 32 infants have died in the Rock 'n Play Sleeper since 2009.

30.     Defendants, who designed, manufactured, marketed and sold the Rock 'n Play Sleeper, which is one of the most popular inclined sleepers in the United States, have known of the risks posed by the product throughout the time they designed, manufactured, marketed and sold the Rock 'n Play Sleeper.  They, nonetheless, continued to market them for a decade as safe environments for prolonged sleep for infants, placing millions of infants at risk.

**Defendants' Introduction and Marketing of the Rock 'n Play Sleeper**

31.     In 2008, a Fisher-Price product designer had the idea of an inclined, upright sleeper for babies with reflux and congestion.  According to the Fisher-Price website, when the designer "approached the Fisher-Price Safety Committee with this idea, they had . . . concerns." (ellipses in original).[18]  Nonetheless, and with no evidence that their "concerns" were addressed, Defendants introduced the Rock 'n Play Sleeper in the United States market in 2009 and have received hundreds of millions of dollars from its sale.

32.     A critical common design element of the Rock 'n Play Sleeper is a collapsible frame that supports a fabric hammock with tall sides (Figure 1), forcing the infant into a reclined position, with the head elevated at an approximately 30-degree angle from the lowest part of the baby's torso (Figure 2) and restraints (Figure 3) that, if used as Defendants recommend, limit the baby's motion at the hips and waist.  There is a hard plastic shell inside the hammock that is covered with

---

[17] Id.

[18] https://www.fisher-price.com/en_US/ourstory/rock-n-play-sleeper/index.html (removed by Fisher-Price).

soft padded material (Figures 4 and 5), upon which the baby is placed. Different views of the product are shown below:



Above: Figure 1



Above: Figure 2



Above: Figure 3



Above: Figure 4



Above: Figure 5

33.     Some "Premium" and "Deluxe" models, such as the deluxe model immediately above, have additional padding around the head.

34.     The Rock 'n Play Sleeper does not allow the baby to sleep in a supine position, as recommended by infant sleep safety experts, and is obviously not flat.  Therefore, it does not

comply with the guidelines promulgated by infant sleep experts and medical professionals that a firm mattress, covered by a sheet, is the safest sleeping environment for infants.

35.    Despite knowing that the Rock 'n Play Sleeper is unsafe for overnight or prolonged sleep for infants, Defendants marketed and sold the product as a sleeper, leading parents to reasonably believe that the product is safe for its stated purpose.  The words "sleeper" and "sleep" appear no fewer than five times on the package, which depicts pictures of a mom blissfully sleeping or about to fall asleep with the baby in the Rock 'n Play Sleeper.

36.    The Rock 'n Play Sleeper is extremely popular with parents because it rocks the baby, and various models have other soothing features such as lullabies and vibrations.  Because of these characteristics, the Rock 'n Play Sleeper is one of the best-selling "sleepers".

**National Standards for Safe Infant Sleep**

37. The National Institutes of Health ("NIH") of the United States Department of Health and Human Services and other federal and national organizations have worked with the AAP, a non-profit group with a membership of 66,000 primary care pediatricians, pediatric medical subspecialists and pediatric surgical specialists, to develop safe sleep standards for babies.[19] Defendants, as manufacturers and marketers of widely sold infant sleepers, are indubitably well aware of NIH and AAP standards.

38. In November 2005, well before Defendants first began to market the Rock 'n Play Sleeper, the AAP issued a Policy Statement entitled -- The Changing Concept of Sudden Infant Death Syndrome: Diagnostic Coding Shifts, Controversies Regarding the Sleeping Environment,

---

[19] https://www.nih.gov/news-events/news-releases/federal-agencies-express-support-updated-safe-infant-sleep-recommendations (last visited May 28, 2019).

and New Variables to Consider in Reducing Risk," -- which contained detailed guidelines and

recommendations on safe sleep for babies.[20]   These included:

- "Back to sleep: ***Infants should be placed for sleep in a supine position (wholly on the back) for every sleep***…" (Emphasis added).

- "Use a firm sleep surface: ***Soft materials or objects . . . should not be placed under a sleeping infant.***   A firm crib mattress, covered by a sheet, is the recommended sleeping surface."  (Emphasis added).

39.  The AAP also recommended that, in order to avoid development of positional

plagiocephaly (flat head), parents should[21]:

- Avoid having the infant spend excessive time in car seat carriers and "bouncers," in which pressure is applied to the occiput [sic].

and:

- Alter the supine head position during sleep.

40.  In January 2006, the NIH issued a news release adopting the AAP's guidelines.[22]

Among other things, the NIH stated:

> The AAP recently issued updated recommendations for reducing the risk of Sudden Infant Death Syndrome:
>
> - Always place your baby on his or her back to sleep, for naps and at night;
> - Place your baby on a firm sleep surface, such as on a safety-approved crib mattress, covered by a fitted sheet; and
>
> - Reduce the chance that flat spots will develop on your baby's head by . . . changing the direction that your baby lies in the crib[] and avoiding too much time in car seats, carriers, and bouncers.

---

[20] https://pediatrics.aappublications.org/content/pediatrics/138/5/e20162938.full.pdf (last visited May 28, 2019)

[21] Id.

[22] https://www.nichd.nih.gov/newsroom/releases/sids_winter (last visited May 28, 2019).

41. The Rock 'n Play Sleeper is not a crib mattress. It features raised soft sides. It is positioned at an angle similar to that of a car seat or carrier. Simply put, it is undeniably unsafe for sleep under AAP guidelines.

42. Nonetheless, Defendants introduced it to the market as a safe overnight sleep product in 2009 and continued to market and sell it as such in the U.S. market for a decade, until they were forced to issue a recall on April 12, 2019.

43. In October 2011, the AAP issued an updated Policy Statement – SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment – expanding the guidelines and recommendations on safe sleep for babies.[23] The recommendations included:

- Infants should be placed "back to sleep for every sleep" in the "***supine position (wholly on the back)***." The AAP noted that ***"[t]he supine sleep position does not increase the risk of choking and aspiration in infants, even those with gastroesophageal reflux.* . . ."** (Emphasis added).

- "Elevating the head of the infant's crib while the infant is supine is not recommended" because "it might result in the infant sliding to the foot of the crib into a position that might compromise respiration."

- "Use a firm sleep surface – ***A firm crib mattress covered by a fitted sheet, is the recommended sleeping surface to reduce the risk of SIDS and suffocation***." (Emphasis added).

- "***Soft materials . . . should not be placed under a sleeping infant***." (Emphasis added).

- "***Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep* . . . .**" (Emphasis added).

- "If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is practical."

- "Avoid commercial devices" like "wedges, positioners, special mattresses and special sleep surfaces. There is no evidence . . . that they are safe."

---

[23] https://pediatrics.aappublications.org/content/128/5/1030 (last visited May 28, 2019).

44. The NIH promptly issued a news release supporting these updated AAP guidelines and stated that the United States Food and Drug Administration and other major entities also supported them. The NIH's release provided a link to the full AAP guidelines and stated: "Support for the new recommendations was expressed by the Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD) at the National Institutes of Health, the Maternal and Child Health Bureau (MCHB) of the Health Resources and Services Administration, the U.S. Centers for Disease Control and Prevention, and the U.S Food and Drug Administration."[24]

45. On October 24, 2016, the AAP issued a further updated Policy Statement – SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment – reaffirming and further developing the guidelines and recommendations on safe sleep for babies.[25] The recommendations included:

- "Recommendations for a safe sleep environment include supine positioning, the use of a firm sleep surface, . . . and the avoidance of soft bedding . . . ."

- "[M]anufacturers should follow safe sleep guidelines in their messaging and advertising."

- "Avoid the use of commercial devices that are inconsistent with safe sleep recommendations."

- "[I]nfants should be placed for sleep in a supine position (wholly on the back) for every sleep by every caregiver until the child reaches 1 year of age. . . . The supine position does not increase the risk of choking and aspiration in infants, even those with gastroesophageal reflux . . . ."

- "Elevating the head of the infant's crib is ineffective in reducing gastroesophageal reflux and is not recommended; in addition, elevating the

---

[24] https://www.nichd.nih.gov/newsroom/releases/101811-infant-safe-sleep-recommendations (last visited May 28, 2019).

[25] https://pediatrics.aappublications.org/content/138/5/e20162938 (last visited April 10, 2019). Although issued on October 24, 2016, the recommendations are dated as of November 2016.

head of the crib may result in the infant sliding to the foot of the crib into a position that may compromise respiration."

• "[T]he best evidence suggests that infants should continue to be placed supine until 1 year of age. . . . Because rolling into soft bedding is an important risk factor for SUID [Sudden Unexpected Infant Death] after 3 months of age, parents and caregivers should continue to keep the infant's sleep environment clear of soft or loose bedding."

• "Infants should be placed on a firm sleep surface (e.g., mattress in a safety-approved crib) covered by a fitted sheet with no other bedding or soft objects to reduce the risk of SIDS and suffocation."

• "Soft materials . . . should not be placed under a sleeping infant."

• "Sitting devices, such as car seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep in the hospital or at home, particularly for young infants."

• "If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is safe and practical."

• "Media and manufacturers should follow safe sleep guidelines in their messaging and advertising. . . . Media and advertising messages contrary to safe sleep recommendations may create misinformation about safe sleep practices."

46.    The same day, the NIH issued a corresponding news release, stating that "Federal agencies concerned with infant health and welfare today announced their support of the American Academy of Pediatrics (AAP) updated recommendations on safe infant sleep. . . . The Eunice Kennedy Shriver National Institute of Child Health and Human Development, part of the National Institutes of Health, the Centers for Disease Control and Prevention, and the Maternal and Child Health Bureau of the Health Resources and Services Administration and the U.S. Food and Drug Administration urge everyone who cares for infants younger than 1 year of age — parents,

grandparents, family members, child care providers, health care providers, and others — to learn about the updated recommendations for safe infant sleep."[26]

47.    Despite the expanded repeated warnings that the only safe sleep environment for babies is a firm flat surface with no soft materials, and that car seats, infant carriers, and similar devices should not be used for prolonged sleep, Defendants continued to market their Rock 'n Play Sleeper, which positions infants for overnight sleep at a significant incline (as in a car seat), in restraints, and on soft padded material, in the U.S.

48.    Further, while Defendants knew of the AAP's exhortation that "manufacturers should follow safe sleep guidelines in their messaging and advertising" and "advertising messages contrary to safe sleep recommendations may create misinformation about safe sleep practices," Defendants marketed and sold the unsafe Rock 'n Play Sleeper as a suitable sleeping environment for prolonged sleep for infants.

**The AAP's Response to CPSC's Request for Comment on Inclined Sleepers**

49.    The CPSC has no guidelines regarding inclined sleepers, but, in February 2017, it issued a Notice of Proposed Rulemaking for a Rule entitled, "Safety Standard for Infant Inclined Sleep Products," and invited public comment.[27] The AAP and numerous widely respected consumer protection groups responded with public comments detailing the dangers of these products. Given the significant impact that a CPSC standard could have on a major product like the Rock 'n Play Sleeper, it is beyond question that Defendants were aware of the proposal and comments.

---

[26] https://www.nih.gov/news-events/news-releases/federal-agencies-express-support-updated-safe-infant-sleep-recommendations (last visited May 28, 2019)

[27] https://www.govinfo.gov/content/pkg/FR-2017-04-07/pdf/2017-06875.pdf (last visited May 28, 2019).

50.     On July 5, 2017, the AAP submitted a comment letter stating that, "***the AAP has concerns about all inclined sleep products and the hazards they may pose to infants***."  (Emphasis added).  The AAP drew an obvious analogy to "car safety seats, strollers, swings, infant carriers and infant slings, which are also not recommended for routine sleep," noting that "***[i]nfants who are younger than four months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction***."[28] (Emphasis added).  The AAP's comments about products sold as "inclined sleepers" are as significant and reliable as their comments about these other similar products.

**Consumer Groups' Response to CPSC's Request for Comment**

51. The AAP is not the only organization to warn about the dangers of inclined sleepers such as the Rock 'n Play Sleeper.  On June 21, 2017, the Consumer Federation of America, Kids in Danger, Consumers Union, and Public Citizen submitted a comment letter to the CPSC,[29] stating:

> [W]e have significant concerns with the hazards posed by the entire product class of infant inclined sleepers . . . . .  Unlike bassinets, infant inclined sleep products do not place the baby in the recommended flat sleep position . . . .  Some parents might believe their baby sleeps better at an incline, which may explain the rise in these types of products.  However, there have been no studies that show this to be true, and most safe sleep professionals support a flat sleep surface.

52. This group's letter raised an additional significant point:

> [M]any of these products require a restraint for infant retention.  There has been little, if any, academic study on the impact of continuous restraining on infants and development or the risks that restraints could pose in a sleep environment.

---

[28] July 5, 2017 AAP Comment Letter on Proposed Safety Standard for Inclined Sleep Products. Docket No. CPSC-2017-0020.

[29]
https://www.citizen.org/system/files/case_documents/consumer_group_comments_on_inclined_infant_sleep_products_062117.pdf (last visited May 28, 2019).

53. The consumer groups also raised real world concerns about the context in which these products are used:

> Infant inclined sleep products are designed for infants who are not likely to distinguish between daytime and nighttime sleeping, but rather nap throughout the entire 24-hour period. The parents or primary caregivers of these infants are likely to be operating on less sleep, and if the infant is a first child, be less familiar with baby gear and care. In addition, many other caregivers may use the product. Visitors, grandparents, helpers and others may be as likely to lay the baby down to sleep as the parent. Since new parents often sleep or nap when their baby is sleeping or have other children or activities requiring their attention throughout the house, it should be expected that babies will sleep unattended in inclined sleep products, both at night and during the day. Therefore, it is vital that these sleep environments offer infants the same measure of safety as a full-size crib.

54. This letter also noted that there is a standard for bassinets that was revised with CPSC support to require a flat surface without restraints. If it is dangerous for babies to be in bassinets that are not flat or include restraints, the same is necessarily true of inclined sleepers like the Rock 'n Play Sleeper.

55. On June 13, 2018, these and still other consumer groups, joined by the AAP, wrote another public letter to the head of the CPSC detailing the dangers of inclined sleepers. The signers of this letter included the Director of Product Safety for Consumer Reports, the President of the American Academy of Pediatrics, the Legislative Director and General Counsel for the Consumer Federation of America, the Senior Policy Analyst of the Consumers Union, and the Executive Director of Kids in Danger.[30] This letter was written in response to the CPSC's issuance of a reminder that caregivers should use restraints with inclined sleepers.

56. The letter expresses concern about the "***inherently unsafe inclined sleep products***, the use of which does not align with American Academy of Pediatrics (AAP) safe sleep

---

[30] https://advocacy.consumerreports.org/research/joint-letter-to-cpsc-chairman-on-infant-inclined-sleep-products/ (last visited May 28, 2019).

recommendations." (Emphasis added).   It states, "[W]e are concerned that one of the main suggestions for consumers in this statement—to secure restraints while using the product—may not prevent deaths linked to use of this type of product."

57.   The letter further states that:

Parents and caregivers may seek out inclined sleep products out of concern about gastroesophageal reflux in their infants. However, the AAP's safe sleep experts have reviewed extensive research and concluded that elevating the head of the infant's crib or using an inclined sleep product while the infant is supine (placed on his or her back), is not recommended. It is ineffective in reducing gastroesophageal reflux; in addition, it might result in the infant sliding to the foot of the crib into a position that might compromise respiration.
…

Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are also not recommended for routine sleep in the hospital or at home.  Infants who are younger than 4 months are particularly at risk, because they might assume positions that can create a risk of suffocation or airway obstruction.  If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is practical.

For these reasons, *we are deeply concerned that the CPSC's May 31 announcement makes it seem, incorrectly, that inclined sleep products are safe if used with restraints*.  The CPSC fails to provide any data upon which it bases this implicit claim, and *we are concerned that this improper portrayal of infant inclined sleep products could result in additional infant deaths and injuries*.

. . . .  [A] bare crib is best, babies should be placed on their backs for every sleep time, and parents and caregivers should use a sleep product that meets current mandatory standards such as cribs, play yards, and bassinets for very young infants.  *Using restraints in a sleep product, allowing inclines in sleep products that might allow rolling into unsafe positions, and other hazards present in current inclined sleep products should not be promoted by the CPSC*.

(Emphasis added).


**Congresswoman Schakowsky's Letter to the Chairwoman of the CPSC**

58.     On July 30, 2018, Congresswoman Janice Schakowsky (D – IL), sent a letter to Ann Marie Buerkle, Chairwoman of the CPSC, expressing her concerns about the CPSC's proposed rule and its May 2018 Consumer Alert.[31]  In her letter, the Congresswoman, citing the "repeated calls by many safety advocates that inclined sleepers are inherently unsafe," wrote that she is "concerned that [the CPSC] is not adequately protecting consumers from hazards posed by inclined sleep products" and "urged" the agency "to more aggressively review whether those products are safe."

59.     Congresswoman Schakowsky also wrote:

> The Consumer Alert conveys the misleading impression that the sole causes of infant deaths are rolling over due to lack of restraints or because infant sleepers were used after an infant can roll over.  By doing so, it also implies that infants will not roll over as long as restraints are used and fails to consider that caregivers often do not know the exact moment an infant first rolls over.  Rollovers may occur while the infant and caregiver are both asleep.

60.     On August 21, 2018, Chairwoman Buerkle responded to the Congresswoman's letter stating, among other things, that the agency had "learned of additional serious incidents in recent months" and thus "ratcheted up the resources and senior staff attention being devoted to this class of products.[32]

61.     Despite all of the foregoing, Defendants continued to market and sell their dangerous inclined sleeper for overnight and prolonged sleep, thereby knowingly putting an untold number of babies at risk, until the Recall.

---

[31] https://www.wsj.com/public/resources/documents/schakowsky-to-cpsc-07-30-2018.pdf?mod=article_inline (last visited May 28, 2019).

[32] Voight, H., Infant Sleep Deaths in Focus in Fight over Role of Consumer Safety Agency, Wall Street Journal, Nov. 23, 2018, available at https://www.wsj.com/articles/infant-sleep-deaths-in-focus-in-fight-over-role-of-consumer-safety-agency-1542974400 (last visited May 28, 2019).

**Canadian and Australian Regulators Prohibit Selling the Rock 'n Play Sleeper as a "Sleeper"**

62.     In 2011, the governments of Canada and Australia expressly prohibited Defendants from selling the Rock 'n Play Sleeper as a "sleeper" in their countries.  That Defendants were forced to stop selling their product as a "sleeper" in those countries indisputably demonstrates that Defendants knew their product was considered to be dangerous by regulators and, thus, their marketing of the Rock 'n Play Sleeper as a safe sleep environment in the U.S. was false and misleading.

63.     In January 2011, the Queensland Government Office of Fair Trading wrote to Defendants' affiliate in Australia regarding its concerns about the Rock 'n Play Sleeper.  The Queensland Government Office of Fair Trading was concerned that Defendants' promotion of the Rock 'n Play Sleeper as an appropriate sleeping environment was at odds with widely accepted best practices (consistent with AAP guidelines) that this type of product should not be used as an infant bedding alternative, and refused to allow Defendants to sell the product in Australia unless all references to prolonged or all night sleeping were deleted.  The Queensland Government Office of Fair Trading was particularly concerned that a newborn could succumb to positional asphyxia through the use of the product.

64.     In March 2011, Defendants' affiliate in Australia provided new box graphics to the Queensland Fair Trading Office eliminating references to overnight sleeping and proposing to call the product a "Soother" instead of a "Sleeper."

65.     Ultimately, however, Defendants decided, rather than to change their marketing, to withdraw the product from sale in Australia.

66.     In February 2011, Health Canada, the federal department of the Canadian government responsible for national health, wrote to Defendants' affiliate in Canada regarding its

concerns that the Rock 'n Play Sleeper failed to comply with recommendations by Health Canada, the Public Health Agency of Canada and the Canadian Pediatric Society that babies sleep on a firm and flat surface (consistent with AAP guidelines).

67.    In addition, in March of 2011, the Mattel Product Integrity Quality and Safety Operating Procedure was revised to advise parents that the Rock 'n Play Sleeper was "not intended to replace a crib or bassinet for prolonged sleep."  Tellingly, this language was removed from the Mattel Product Integrity Quality and Safety Operating Procedure later in 2011.[33]

68.    According to Consumer Reports, the Rock 'n Play is available in Canada but is not called a "sleeper."  Defendants market and sell it in Canada as the "Rock 'n Play Soothing Seat."

69.    However, fully aware of the AAP's guidelines and the objections of Australian and Canadian regulators, Defendants continued to market the product in the U.S. as an overnight sleeper even after 2011.  Defendants did not change the package, the user manual, or any of their marketing materials to disclose that the Rock 'n Play Sleeper should not be used for prolonged sleep and thereby knowingly exposed American babies to the grave risk of death, injury, and developing skull deformities.

**Pediatricians' Warnings to Fisher-Price**

70. In addition to all of the above entities, multiple individual pediatricians have also warned Fisher-Price about the dangers of the Rock 'n Play Sleeper.  For example, pediatrician Dr. Natasha Burgert wrote an open letter to Fisher-Price in 2012,[34] stating:

> **As a pediatrician and parent consumer, I believe it irresponsible to promote the Rock n' Play™ Sleeper as an [sic] safe, overnight sleeping option for infants. By continuing to do so, you are putting babies at risk.**

---

[33] See Expert Report of William F. Kitzes, J.D., dated September 30, 2016, at 6, 7, submitted in Torres et al. v. Imperial Manufactory Ltd., et al. (S.D. Texas, Civ. No. 15-444).

[34] https://www.kckidsdoc.com/kc-kids-doc/dear-fisher-price (last visited May 28, 2019).

The Rock n' Play™ Sleeper should not be used for extended, unobserved infant sleep for the following reasons. First, design features of this product are known to increase the risk of sudden infant death syndrome (SIDS). Second, I have personally seen infants with brachycephaly/plagiocephaly and torticollis as a direct result of using this product. Finally, infants are often left with poor sleep habits that continue long beyond the product's use.

**1. The Rock n' Play™ Sleeper is not a safe place for overnight, unobserved infant sleep.**

The current American Academy of Pediatrics (AAP) guidelines for the prevention of SIDS includes placing baby on a firm sleep surface without extra padding, pillows, or loose items. The Rock and Play™ Sleeper does not adhere to these guidelines. Specifically, the bottom is not firm. And, some models include padded inserts that can move and shift during sleep. In my opinion, this product is a portable infant seat with attached sides, and should be categorized and marketed as such. I am concerned that infants in the "sleeper" may be at risk of asphyxiation or suffocation if continued to be used as a place for overnight, unobserved infant sleep.

**2. The Rock n' Play™ Sleeper puts infants at risk for deformities.**

When an infant is placed in a sleep environment as suggested by the AAP, infants are allowed natural body movements during sleep. They are able to freely move their head from side to side, and move their arms and legs to achieve different comfort positions throughout the night.

As a consequence to babies being restricted to one sleep position for multiple hours per day, infants using the Rock n' Play™ Sleeper are developing plagiocephaly/brachycephaly ("flat head") and torticollis. These are significant diagnoses potentially requiring expensive head-molding helmets and physical therapy.

My observational experience is not unique. There are currently numerous complaints online that should not be ignored. For example, one mother writes:

*We were finally referred to a specialist because we kept voicing our concerns with our pediatrician and it turns out our son was diagnosed with severe brachycephaly and moderate plagiocephaly. We are now getting him fitted for a $3,800 helmet that he'll have to wear 23 hrs each day. He also has torticollis, which is the tightening of the neck muscles, caused by the way he favored one side in the sleeper. He has to do daily stretches which he hates, but hopefully he won't need physical therapy. I truly believe that this sleeper caused these problems and I would NOT recommend this product to anyone...it's just not worth the risk.*

*-From Product Review on Amazon.com*

Frequent tummy time during waking hours, and holding babies in upright positions during play time, are not enough to counter the negative effects in head and body positioning that 16 hours a day in this product will produce.

Lying on a flat, firm surface is a better option for healthy development of our infants; and should be preferred to the physically restrictive, overnight sleep in the Rock n' Play™ Sleeper.

**3. The Rock n' Play™ Sleeper hinders the development of infant sleep habits.**

Learning good nighttime habits, including the ability to self-soothe, is a significant part of a child's growth and development. Patterns surrounding the sleep environment begin at very early ages.  Specifically, foundational patterns of sleep-initiation, environmental experience, and nighttime expectations often begin to be established by 4 months of age.

In my experience, parents who have used the Rock n' Play™ Sleeper face unexpected challenges once their baby outgrows this space.  Families are suffering from many sleepless nights while their older infant re-learns how to sleep, on their backs, in their long-term sleep environment.

(All emphasis in original).

71.     Dr. Burgert's letter also stated:

The Rock n' Play™ Sleeper does not allow body movement to occur during sleep.  The soft-bottomed "sleeper" cradles the infant during sleep and secures this position with an included restrictive safety harness.   These design elements confine an infant in only one position for the entire duration of sleep (up to 16 hours a day).

72.     Another pediatrician reported his communications with Fisher-Price about the product.  According to the blog of Dr. Roy Benaroch, in 2013, he exchanged emails with Fisher-Price about the Rock 'n Play Sleeper's failure to meet the AAP's standards for safe sleep in 2013.[35] He wrote, for example, that "[t]he Newborn Rock 'n Play Sleeper does not keep a baby wholly on the back, but rather in an inclined position.  It is not a safe way for babies to sleep."  He also noted

---

[35] https://pediatricinsider.wordpress.com/2013/04/29/the-fisher-price-rock-n-play-sleeper-is-not-for-sleeping/ (last visited May 28, 2019).

that the AAP guidelines provide that "[s]itting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep in the hospital or at home," and advised Fisher Price that, "[t]hough this sentence doesn't specifically mention your product, the Newborn Rock 'n Play Sleeper is shaped like the devices in this category, and is therefore not recommended for sleep."

73.    Dr. Banaroch reported that Fisher-Price responded to this communication, confirming its receipt. He said that a Fisher-Price representative responded, stating, "Thank you for your inquiry and comments. We did receive your email on February 7, 2013. We have provided these comments to the appropriate people within Fisher-Price. The Rock 'n Play Sleeper complies with all applicable standards."

74.    Defendants do not, however, appear to have taken any steps to address the actual concerns raised in the pediatricians' communications to make the product safe.

**Documented Instances of Infant Death or Injury from the Use of the Rock 'n Play Sleeper**

75.    As stated above, in November 2018, the Wall Street Journal reported that more than 30 deaths and 700 injuries have occurred as a result of the use of inclined sleepers like the Rock 'n Play Sleeper. The specific details of these stories are terrifying and are well-known to Defendants.

76.    In 2015, a mother filed a lawsuit in Texas against Defendants Fisher-Price and Mattel (and others) arising from the 2013 death of her baby daughter in a Rock 'n Play Sleeper.[36] The complaint details the facts of this tragic event.

77.    Specifically, the complaint alleges that on or about October 29, 2013, the mother of an infant woke to find that her daughter, who she had placed in a Rock 'n Play Sleeper, was not

---

[36] Torres et al. v. Imperial Manufactory Ltd., et al. (S.D. Texas, Civ. No. 15-444).

breathing.  The baby was restrained in accordance with Defendants' instructions.  The baby's head was turned to the side with her chin resting on her shoulder.  She died of asphyxiation during the night.

78.    Plaintiff's expert in the Texas case referenced other alarming incidents in his expert report, including the following:  :

a. In 2014, a grandmother in Georgia found her grandson in a Rock 'n Play Sleeper in a strange position, as if his head was stuck.  The baby was turning blue and would not wake up.  The grandmother was sure he had died, but at last he began to breathe.  When the family took him to the hospital, the medical professionals advised them that the most likely cause was positional asphyxiation due to his head being down and cutting off his airway.  After this, the family stopped using the Rock 'n Play Sleeper and put the child on an apnea monitor and found that he did not miss any more breaths while on the monitor.

b. In 2012, the mother of a five-week old baby found her son unable to breathe in the Rock 'n Play Sleeper.  She took him to the hospital, where the doctor gave him a sleep apnea monitor.  The monitor went off the next night while he was sleeping in the Rock 'n Play Sleeper.  The mother found that his chin was down.  The mother put him in a bassinet and he experienced no more episodes.

79.    On January 22, 2018, the parent of an infant who died in his Rock 'n Play Sleeper on January 6, 2018 made this heartbreaking report to the CPSC:[37]

> My 6 month old son was put down for a nap in the Fisher Price Rock n Play.
> During the time of his nap, he rolled over in the Rock N Play and silently
> died.  The Rock N Play is sold as a sleeper and is marketed for "great
> overnight sleep".  My son was 18 pounds well under the limit of 25 pounds
> that the Rock N Play provides as a weight limit for use. An average 9 month

---

[37] https://saferproducts.gov/ViewIncident/1728157?mod=article_inline (last visited May 28, 2019).

old boy is 25 pounds, average for a girl is 12 months old at 25 pounds. Fisher Price has been notified of infant deaths due to their product and will still not recall it. This product cannot be labeled as a sleeper or for "great overnight sleep". ***My son was a beautiful, healthy baby and only died because of the Rock N Play and the false sense of security they provide with their false and UNSAFE claims of the Rock N Play being used for safe sleep. The only place for safe sleep for an infant is a flat surface. This death trap needs to be recalled and labeled as a SUPERVISED PLAY PRODUCT so no other family has to lose their child like I have***. (All sic except emphasis added.)

This report was sent to the manufacturer on July 6, 2018.

80. Another example of a documented instance of injury occurred in March 14, 2018, where an aunt reported a "terrible scare" on a new mothers' website:

> I don't want to scare anyone but wanted to share a story as an FYI because i know so many people use rock and plays for sleep time. My brother and his wife used a rock and play with my niece and recently had a terrible scare. They fed the baby then put her back down the sleep with the rock and play on and she choked and stopped breathing - they had to do CPR to resuscitate.
>
> This was just 2 months ago. Honestly I know everyone uses rock and plays and most babies are fine but they aren't sleep safe for the exact thing that happened to my niece. I talked to my pediatrician about using one because my son spits up a lot and he warned me not to use it for overnight sleep. (All sic except emphasis added.)[38]

81. In addition to asphyxiation, parents continue to report their infants developing flat head and twisted neck (torticollis) syndromes. For example, one consumer posted on Amazon.com on March 16, 2018:

> This product is know[n] to give babies flat heads!! Just got out of the Cranial Technology office with our 4 mo. old who needs to wear a helmet. **The Dr. said rock n plays keep them in business**. (Emphasis added).

82. It is beyond question that Defendants knew of such reviews. ***Indeed, Fisher-Price responded*** to the immediately preceding review, writing:

---

[38] https://community.whattoexpect.com/forums/february-2018-babies/topic/rock-and-play-warning-65446621.html (last visited May 28, 2019).

> We recommend everyone to speak with their pediatrician before using one
> of our Rock 'n Play Sleepers, to see if your baby is a good fit for it. We're
> very concerned about the situation you've described. One of our Consumer
> Services specialists would like to speak with you to get all the information
> we need to take action. Please call us as soon as possible at 1-888-253-
> 4303, between the hours of 9:00 a.m. and 6:00 p.m. EST, Monday – Friday.

83.    Despite the above response and admission, nothing on the product's packaging or

in its advertising suggests that customers should speak to pediatricians before using one.

84.    Many more complaints from customers reporting infant injury are readily available.

Below are some representative examples. (All *sic* except emphasis added).

a.    On October 11, 2018, a mother posted on Amazon.com:[39]

> Please do your research before choosing this as your baby's place to sleep
> It breaks my heart to have to give this once-beloved item one star but
> knowing what I know now I would have never purchased one . . . . By about
> 6 weeks I started noticing that my son's head was flattening at the back,
> widening at the sides and forming an upward slope toward the crown of his
> head. I didn't understand why his head wasn't rounding out, thinking maybe
> it just needed more time. By our 2 month pediatrician appointment, our
> doctor diagnosed our son with Brachycephaly (flat head). I was devastated.
> It quickly occurred to me that it was due to where he had been sleeping (in
> the rock n play). He didn't spend much time on the back of his head other
> than to sleep and after an exhaustive search online and in new parent
> forums, I soon learned I was not alone - he had gotten flat head from the
> rock n play. Many other parents had stated that their child too was
> experiencing "rock n play head". In fact, approximately 50% of 2 month
> olds experience flathead due to back sleeping, many of whom I would bet
> are using this best seller. I later learned that by restricting movement during
> sleep (which of course is great for keeping babies sleeping), the soft insert
> is doubly dangerous since it REALLY keeps them positioned in one
> direction, looking forward applying pressure all night to the center of the
> back of baby's skull. If your child favors one side they will be at risk for
> Plagiocephaly (flattening of one side of the head, which can cause facial
> asymmetry among other issues). We are now faced with having to helmet
> our child and are going for weekly physical therapy appointments to try to
> correct the damage from the rock n play. Our physical therapist admitted
> that the rock n play is keeping her in business . . . .This device is much better
> used in moderation during the day as a lounger than a place to sleep. I urge
> Fischer Price to change the marketing of this "essential" baby gear to a

---

[39] https://www.amazon.com/gp/customer-reviews/R3IUCH2LOOYK02/
ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B00NEO5UTU (last visited May 28, 2019).

'lounger' vs as 'sleeper' and to save others the heartache we are experiencing. Do your research. I wish I had known this beforehand as preventing flathead is infinitely easier than trying to correct it.

b. Yet another example, posted on December 1, 2016:[40]

**A magical device . . . that can also cause torticollis and plagiocephaly/brachycephaly. My husband and I bought a RNP after we brought our son home from the hospital because he would not sleep in his crib or any completely flat surface, and we were desperate . . . . Great, right?! So, why only one star?**

**This device should NOT be used as a bed. Not only does it go against everything we are now taught about SIDS, but because it restricts head movement, it can also cause physical deformities, such as plagiocephaly/brachycephaly (flat head) and torticollis. My son is now 2 months old and just diagnosed with left side plagiocephaly and right torticollis. His head tilts to the right, but rotates to the left and the back, left-side of this head is flat. He favors looking to his left and has a bit of difficulty looking all the way to his right. We have to do stretches for his neck multiple times a day, hold him and feed him differently, and constantly encourage him to look to his right and keep him off the left side of his head as much as possible, in order to try to correct this problem before he requires a very expensive helmet. Not all babies with these conditions get it from a RNP, obviously, but do yourself a favor and google "rock n play torticollis," and you may want to find an alternate sleep solution.**

**The Reaction to Defendants' Belated Admission of Known Infant Deaths and Their "Warnings" to Consumers**

85. As set forth above, on April 5, 2019, Fisher-Price and the CPSC issued a joint press release disclosing to the public the dangers of the Rock 'n Play Sleeper and warned consumers

---

[40] https://www.amazon.com/gp/customer-reviews/R1XPNDFN88Q2VB/ ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B00NEO5UTU (last visited May 28, 2019).

"about the Fisher-Price Rock 'n Play due to reports of death when infants roll over in the product."[41]

86.    While the CPSC and Fisher-Price recommended that consumers stop using the Rock 'n Play when an infant reaches three months of age, or as soon as an infant exhibits rollover capabilities, as set forth above, the AAP recommends that inclined sleepers like the Rock 'n Play Sleeper should never be used for overnight or prolonged sleep for any infants, including newborns, whatever the age.  Thus, after the announcement by CPSC and Fisher-Price, the AAP stated:

> **We don't recommend that babies are placed to sleep with their heads elevated because that is a position that would be subject to accidental suffocation [and] strangulation in bed," said Feldman-Winter of the AAP.  Instead, the AAP says that for prolonged or nighttime sleep, babies should be put on their backs, unrestrained, alone, on a flat, firm surface, such as a mattress covered by a fitted sheet in a bare crib, bassinet, or play yard.[42]**

87.    Further, while the CPSC and Fisher-Price suggest that parents using the restraints on their babies when in the Rock 'n Play Sleeper renders the product safer, the AAP's advice is the opposite:

> **[T]he American Academy of Pediatrics says it does not recommend products for routine sleep that require restraining a baby, especially if that product also rocks. "To [fasten] a baby down to a surface and then rock the baby is not consistent with our recommendations," said Lori Feldman-Winter, M.D., a member of the AAP task force on Sudden Infant Death Syndrome (SIDS) and a professor of pediatrics at Cooper Medical School of Rowan University in Camden, N.J.[43]**

---

[41] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product (last visited May 28, 2019).

[42] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited May 28, 2019).

[43] *Id.*

**The Belated and Inadequate Recall**

88.    As set forth above, on April 12, 2019, after at least 32 infants died, hundreds more were injured, and at least 4.7 million more were exposed to risk of death, Defendants at last recalled the Rock 'n Play.  As noted above, in the recall notice, Defendants stated:

> **Infant fatalities have occurred in Rock 'n Play Sleepers, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances.[44]**

(Emphasis added).  In the notice, Defendants advised, "[i]f you own a Rock 'n Play Sleeper, discontinue use of the item immediately."

89.    It is well known that product recalls generally have a low level of participation. This one is designed to be no different.  Defendants' Recall is cumbersome, inconvenient, restrictive, and confusing to the general public.  Parents who own the product must take it apart and send in the hub assemblies that held parts of the product together.  Parents who had the product for six months or less are eligible for a full refund, while parents who have owned it for longer than six months are only entitled to vouchers for a selection of Fisher-Price products determined by Fisher-Price on a sliding scale based on how long they have owned the Rock 'n Play.  At bottom, the Recall is inadequate and unfair.

90.    Limiting full reimbursement to those who owned the product for six months or less is unfair because the product is not expressly sold for short term use and many parents, including Plaintiff here, obtained the product assuming they would be able to use it for a subsequent child, or, when their baby outgrew it, to share it with a friend or relative with a younger baby.

91.    In addition, vouchers are not an acceptable because they require consumers to purchase more goods from Defendants to be able to be "benefit" from the Recall, which is caused

---

[44] https://service.mattel.com/us/recall/BJD57_ivr.asp (last visited May 28, 2019).

by Defendants' indefensible misconduct. As stated by Nancy Cowles, executive director of Kids in Danger, vouchers based on a sliding scale "will discourage participation."[45]

92.     Moreover, under the Recall, parents will not be compensated for all costs they incurred in connection with the product, such as shipping, handling and other charges paid when the original purchase of the product was made.   Parents who were using the product for their infants' overnight sleep up to the time of the Recall may now have to rush out and by a new place for their babies to sleep with no recompense.

**Defendants' Deceptive Advertising and Marketing**

93.     Despite their indisputable knowledge of the AAP's guidelines; individual physicians' and consumer groups' recommendations that babies sleep supine, that their heads not be elevated, that they sleep on a firm surface without soft materials, and that sitting devices such as car seats, strollers, swings, infant carriers and infant slings are not recommended for routine sleep; the products being banned as "sleepers" in Australia and Canada; and the numerous reports of injury and even death, Defendants have marketed and continued, until April 12, 2019, to market the Rock 'n Play Sleeper in the U.S. as suitable for all night sleep for babies.

94.     Defendants' deceptive advertising of the Rock 'n Play Sleeper as suitable for overnight sleep for babies takes two primary forms: online and in-store.   Online advertising appeared on the Fisher-Price website as well as other websites where the product was sold (such as Amazon.com).   In-store advertising appeared in the numerous stores where the Rock 'n Play Sleeper was sold.

---

[45] https://www.washingtonpost.com/business/2019/04/12/after-reports-infant-deaths-nearly-million-fisher-price-rock-n-play-sleepers-recalled/?utm_term=.78925f7f3e37&wpisrc=nl_rainbow&wpmm=1 (last visited April 18, 2019)

95. Defendants' deceptive advertising of the Rock 'n Play Sleeper starts with its very name: "*Sleeper*." By naming the product a "Sleeper," Defendants misled consumers into believing that the product is a safe and suitable place for babies to sleep. A reasonable consumer would assume the Rock 'n Play Sleeper's design is consistent with the applicable guidelines and recommendations about how babies should be safely placed to sleep. As described above, the product actually is unfit for use as an infant sleeper.

**False and Misleading Representations on the Boxes**

96.    One of the principal means of in-store advertising is the box in which the product is packaged. The boxes prominently tout that the product is suitable for all-night sleep as illustrated by the figures below showing typical packaging:



Above: Figure 6



Above: Figure 7



Above: Figure 8

97.    The marketing statements on the packaging conflict with the AAP's guidelines and recommendations, and those of other infant sleep experts.

98.    For example, Defendants' statements that "Baby can sleep at a comfortable incline all night long!" (Figure 6), "Comfortable incline for babies that need it" (Figure 7), and "Incline

or Recline – Choose the position that baby likes best" (Figure 8) are contrary to the AAP's guidelines and recommendations that babies sleep supine and that their heads not be elevated.

99.    Defendants' statement that "Extra-plush fabrics for extra-comfy sleep" (Figure 6) is contrary to the AAP's guideline and recommendation that soft materials should not be placed under a sleeping infant.

100.    Defendants' statements that the product is a "Nighttime sleeper and playtime seat!" (Figure 7) and an "Adjustable seat for all-night sleep!" (Figure 8) is contrary to the AAP's guideline and recommendation that sitting devices are not recommended for routine sleep.  Similar statements appeared on all of Defendants' packaging for the Rock 'n Play Sleeper at all relevant times.

101.    Defendants' deceptive marketing of the product as a "Sleeper" for overnight or prolonged sleep is material to consumers' decision to purchase and/or own the product, because it causes consumers to reasonably believe the product is safe.  Defendants should not have marketed, and should not be marketing, the product as a "Sleeper" suitable for overnight sleep.  Alternatively, Defendants should have disclosed, and should disclose, in their marketing statements that using the product for overnight sleep is dangerous and contrary to medical guidelines and recommendations because this information would be material to a consumer's decision as to whether to purchase and/or own the product.

102.    However, Defendants' deceptive marketing of the Rock 'n Play Sleeper as a "Sleeper" when its use as such conflicts with the applicable medical guidelines and recommendations not only exposed Class members' infants to serious risk of injury and even death, but it also induced consumers who would not have otherwise purchased the product to purchase it, to own and use it when they would not have otherwise owned and used it, and/or to

pay a higher price than they would have otherwise paid for the product were it not false or misleadingly advertised.

**False and Misleading Representations on Product Webpages**

103.    Defendants' marketing on the Fisher-Price.mattel.com website also conflicts with the AAP's guidelines and recommendations, touting the Rock 'n Play Sleeper as a "Nighttime sleeper and playtime seat in one!  This inclined sleeper rocks!  The supportive, angled seat back keeps baby elevated for playtime and inclined sleep (the way some babies sleep best!), to help baby sleep allllll [sic] night long."[46]

104.    The product webpages for the Rock 'n Play Sleeper on Defendants' website, replicated in significant part on the websites of other distributers such as Amazon and Target, make similar misrepresentations to those on the box.

105.    The webpages also stated:

**"The inclined seat helps baby sleep all night long;"[47]**

**and**

**"An extra-deep seat helps baby sleep all night long."[48]**

106.    These webpages show pictures of mothers lying down in bed with their babies in Rock 'n Play Sleepers next to them, which indicates that mothers can sleep while their babies sleep in the product.  These statements and images are misleading for the same reasons the images on the boxes are misleading.

---

[46] https://fisher-price.mattel.com/shop/en-us/fp/moonlight-meadow-deluxe-newborn-rock-n-play-sleeper-chx77 (removed by Fisher Price).

[47] https://fisher-price.mattel.com/shop/en-us/fp/baby-sleepers/newborn-rockn-play-sleeper-bct91 (removed by Fisher Price).

[48] https://fisher-price.mattel.com/shop/en-us/fp/baby-sleepers/auto-rock-n-play-sleeper-aqua-stone-fashion-chn28 (removed by Fisher Price);

**False and Misleading Representations About Safety**

107.    Defendants misled consumers of Rock 'n Play Sleepers by having safety be a central component of their brand image.

108.    For example, Defendant Fisher-Price has a webpage dedicated to safety.[49]  This page is titled, "A Safety Story," and states:

> **IT ALL STARTS WITH SAFETY**
> **Squeals of delight, sighs of contentment, giggles of joy . . . those are some of the reactions we hope for from families using our babygear and toys. There's a less visible one, too:  peace of mind.**
>
> **"Parents have trusted us for more than 80 years to provide safe products for their children, but we know we must still earn their trust every day," says Kitty Pilarz, Vice President of Product Safety & Regulatory Compliance at Fisher-Price.  "So, right from the start of a design concept, we work to make sure our products are as safe as they can be."**
>
> **To standards and beyond**
>
> **There's an entire team of quality engineers who work closely with design groups to make sure every product not only meets U.S. safety regulations and international standards, but lives up to the traditionally high Fisher-Price standards of quality, as well as consumer expectations.  A significant amount of testing is done all along the way.**

109.    This is not true, because, for all of the reasons set forth herein, the Rock 'n Play Sleepers are not "as safe as they can be," and instead are dangerous for all night sleep, the purpose for which they are advertised.

110.    The "Safety Story" continues:

> **Listening to consumers**

---

[49] https://www.fisher-price.com/en_US/ourstory/safety/index.html (last visited May 28, 2019).

> **"We welcome feedback from consumers—it's critical to helping us make better products,"** says Gary Cocchiarella, Director of Consumer Services. **"Families don't hesitate to share their opinions, so we collect, analyze and share their comments with our teams.  That way, we can detect and solve problems quickly, as well as improve our design and manufacturing processes."[50]**

111.    This too is false.  Defendants did not modify the Rock 'n Play Sleeper for a decade despite complaints from parents about the safety of the product, documented reports of infant death and injury from its use, and warnings from pediatricians and consumer protection advocates that inclined sleepers such as the Rock 'n Play Sleeper are unsafe.

112.    The overarching message on Mattel's website is also safety.  Among other things, the website states that the most important part of creating its products is to make sure they are safe and that its internal product safety procedures are designed to meet or exceed applicable regulations and laws.[51]

113.    Defendants' marketing has led parents and other consumers of Rock 'n Play Sleepers to reasonably believe that the products have been tested, comply with all applicable regulations and laws, and are fit for their intended use.

**Defendants' In-Box Disclosures Are Materially Misleading**

114.    Defendants' limited disclosures inside the Rock 'n Play Sleeper box do not disclose the inherent danger of the product and are worded in such a way that they are intentionally misleading.  These in-box disclosures also make recommendations that parents cannot possibly follow.  There are no disclosures on the box itself.

---

[50] Id.

[51] http://citizenship.mattel.com/inspired-design/ (last visited May 28, 2019).

115.    There is a warning label attached to the soft padded material inside the Rock 'n Play Sleeper that cannot be read – if an exhausted parent notices or reads it at all – until the product is removed from the box.  The "warning" states:



Above: Figure 9

116.    Because a parent cannot see the label until after opening the box, these statements on the padding label, even if they were adequate warnings (which they are not), cannot inform a consumer's decision about whether to purchase or obtain the product.  Even if the disclosures were on the box, they would be insufficient and useless due to numerous dangerous omissions that render them materially misleading.

117.    First, Defendants state that infants have suffocated "on added pillows, blankets and extra padding" (emphasis added), leading parents to reasonably believe that the padding that comes with the Rock 'n Play Sleeper is safe and cannot cause suffocation.  Indeed, the statement that follows states:  "[u]se ONLY the pad provided by Fisher-Price.  NEVER place extra padding or beside an infant."  As Defendants are well aware, the AAP guidelines state any soft material under a baby can cause suffocation.  As described above, numerous instances of babies suffocating because of the padding that comes with inclined sleepers have been reported.

43

118.    Further, Defendants omit the critical material fact that babies can also die due to positional asphyxiation.   Positional asphyxiation can occur when a baby tips to one side and because of an inclined back position, is unable to pull herself out of that position, and her face either presses into the soft fabric of the sides, or her neck is bent at such an angle that oxygen cannot get through.   Numerous deaths and injuries from positional asphyxiation have been documented.

119.    Similarly, in a so-called warning that is obviously designed to mislead parents while skirting the AAP's guidelines, Defendants state, "ALWAYS place child on back to sleep."   But Defendants omit the crucial fact that parents should always place infants supine – flat on their backs – for overnight or prolonged sleep, and that allowing babies to sleep on an incline is dangerous.   Given its marketing as an overnight sleeper, reasonable parents cannot be expected to conclude that the warning means anything other than placing the infant on its back in the sleeper.

120.    Significantly, this supposed warning is not listed under the "suffocation hazard," which only mentions using an additional layer of padding, but is listed separately.   Thus, even with the misleading partial disclosure, Defendants omitted the asphyxiation hazard that the AAP guidelines are designed to prevent.

121.    In addition, Defendants state that parents should "always use the restraint system," but fail to disclose that the use of restraints on babies in the Rock 'n Play does not render the Rock 'n Play safe and, indeed, may itself be dangerous.   Defendants omit the material fact that baby deaths and many injuries have occurred when using restraints on a baby in the Rock 'n Play Sleeper.   Nor do they disclose that strapping a baby for up to 16 hours at a time in the sleeper can result in physical deformities in the baby's head and neck.

122.    Defendants further state that parents should "always provide the supervision necessary for the continued safety of your child," while promoting the Rock 'n Play Sleeper as an

all-night sleeper.  This instruction is impossible to comply with because a sleeping parent is in no position to supervise her child.

123.    Finally, Defendants advise parents that "[w]hen used for playing, never leave a child unattended," which suggests that a parent could safely leave the child unattended when the sleeper was not being used for play — such as when the infant is sleeping.

**Defendants' Disclosures in the User Manual Are Materially Misleading**

124.    The user manuals for Rock 'n Play Sleepers, which are substantially similar in all material respects, also contain misrepresentations and omissions.  These manuals are inside the boxes in which the products were sold.

125.    The manuals contain warnings substantially similar to the one below:



Above: Figure 10

126.    Like the warning label on the padding, this warning omits the risk that use of the Rock 'n Play Sleeper can result in positional asphyxiation.  Also like the warning label on the padding, this user manual warning instructs consumers to always use the restraint, but it does not disclose that keeping a baby restrained for extended periods of time can result in deformations to the head or neck.  And, again, like the warning label on the padding, this warning instructs users

to, "always provide the supervision necessary for the continued safety of your child," but it ignores the fact that this is not possible when the baby is in the Rock 'n Play Sleeper for overnight sleep.

127.    The warning section in the manual also includes slight variations on the language in the label on the padding, but the overall impact is no less misleading.  For example, the warning section in the manual uses the acronym "SIDS" and states, "[t]o reduce the risk of SIDS, pediatricians recommend healthy infants be placed on their backs to sleep," but it does not say that the recommendation is actually that babies should be supine and not on an incline.

128.    In addition, the warning section in the manual states:

> **ALWAYS use the pad provided, which includes the restraint. NEVER add a mattress, pillow, comforter, or padding.**
>
> **SUFFOCATION HAZARD: – Infants can suffocate:**
>
> **- in gaps between an extra pad and the side of the product.**
>
> **- on soft bedding.**

This is misleading because it does not disclose that the pad that comes with the product and the soft fabric walls that are a part of the product themselves pose risk a risk of suffocation.

129.    The manuals are also misleading in ways beyond the inadequate and misleading warning section.  For example, the manuals show images of mothers lying down in bed, covered with blankets, which indicates either that they are ready for sleep or awakening from sleep.  Below is an example:[52]

---

[52] https://service.mattel.com//instruction_sheets/BCG43-2L.pdf (removed by Mattel); see also https://www.manualslib.com/manual/1084045/Fisher-Price-Deluxe-Auto-Rock-N-Play-Chn19.html (last visited May 28, 2019).



Above: Figure 11

130.    This image is misleading because it implies that mothers can sleep when their babies are in the sleepers, while, at the same time, Defendants warn that babies should be supervised when in a Rock 'n Play Sleeper.  Mothers cannot supervise their children when they are themselves sleeping.

131.    The manuals also contain a section titled, "Preventing Baby's Head from Flattening."   This Section contains numerous statements that are misleading due to misrepresentations or omissions, including that:

> **Pediatricians and child health organizations agree that healthy babies should be placed on their backs to sleep for naps and at nighttime, to reduce the risk of Sudden Infant Death Syndrome (SIDS).  But babies who are always on their backs can sometimes develop flat spots on their head (plagiocephaly) . . . .**

This statement is misleading because it does not say that pediatricians recommend babies be *flat* on their back, thereby implying that sleeping on the back at an incline is consistent with medical recommendations.

132.    The guidelines also instruct users:

**Change the location of your baby's sleeper or crib in the room, so she has to look in different directions . . . .**

This is also misleading because it implies that sleepers and cribs are equally safe.  It does not acknowledge the additional risks that are presented by the baby being strapped in and on an incline in a Rock 'n Play Sleeper.

133.    These guidelines also recommend:

**Help your baby avoid resting his head in the same position all the time by frequently changing the direction he lies in the crib.  For example, have your baby's feet point toward one end of the crib for a few days, and then change the position so his feet point toward the other end of the crib.  This will encourage your baby to turn and look in different directions.**

This, of course, is impossible in a Rock 'n Play Sleeper.  A baby is not supposed to be in a sleeper with its feet in the elevated end and its head dangling below.   Again, Defendants do not acknowledge that a Rock 'n Play Sleeper is not a crib, is less safe than a crib, and that a crib allows for the baby to sleep supine, while the Rock 'n Play Sleeper does not.

134.    The guidelines further recommend:

**Try to minimize the amount of time your baby spends in car seats, carriers and bouncy seats while awake.**

This statement is materially misleading because it omits "sleepers" from this list, although inclined sleepers pose the same risks as the devices on the list. In a further attempt to differentiate the Rock 'n Play Sleeper from this group of products, Defendants suggest parents minimize the amount their babies spend in these products while awake.

135.    In short, Defendants knew, at all relevant times, of the grave risks that their Rock 'n Play Sleeper posed to babies, and that the product was unfit for its intended use as an infant

sleeper for overnight or prolonged use. Nonetheless, they introduced it to the U.S. market as an infant sleeper – but were prevented from doing so in Canada and Australia – using the material misrepresentations and omissions detailed above. As a result, Ms. Fieker and other members of the proposed classes were damaged and are entitled to all monetary and equitable relief provided by law.

## TOLLING OF THE STATUTE OF LIMITATIONS

**Continuing Act Tolling**

136.    Beginning in 2009, Defendants continuously marketed and sold the dangerous Rock 'n Play Sleeper to unsuspecting parents and caregivers of infants. They continuously represented these inclined hammocks as safe environments for all night or prolonged infant sleep. By continuously repeating these false representations, and failing to disclose that the Rock 'n Play Sleeper was defectively designed and exposed infants to great risk of injury and death, Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Defendants might seek to apply.

137.    Defendants' knowledge of the defects is evidenced by, inter alia:  numerous complaints by consumers of injury and death (to some of which they responded); by warnings from the AAP and major consumer groups; by a lawsuit against them for an infant's death; and by Canada's and Australia's refusal to allow them to sell the device as a "sleeper."

138.    Thus, Defendants indisputably possessed continuous knowledge of the dangers posed by the Rock 'n Play Sleeper, and, yet, they inexplicably continued to repetitiously market and sell them as safe environments for overnight and prolonged sleep. Plaintiff's and other Class members' claims are not time barred.

**Fraudulent Concealment Tolling**

139.    Defendants had a duty to disclose to Plaintiff and the Class members the true quality and nature of the Rock 'n Play Sleeper, that the Rock 'n Play Sleeper has a uniform defect, and that the Rock 'n Play Sleeper poses safety concerns.

140.    This duty arose, inter alia, due to their overt representations that the Rock 'n Play Sleeper was safe for overnight use.

141.    Defendants have known at all relevant times of the risks that its Rock 'n Play Sleeper poses to infants.  Prior to selling it, Defendants knew or should have known about the AAP's 2005 recommendations concerning safe sleep, which state that babies should sleep flat on their backs in an empty bassinet or crib.  As of 2011, Defendants knew or should have known that the AAP expanded on those warnings and when Canada and Australia prohibited them from selling the Rock 'n Play Sleeper as a "sleeper."  In the following years, Defendants knew or should have known as pediatricians wrote to them and they were sued due to an infant's death.  And, finally, in 2016, Defendants knew or should have known when the AAP further expanded on its recommendations.

142.    Despite their knowledge of the defective design and danger of the product when used as intended, Defendants failed to disclose and concealed this material information from Plaintiff and other Class members, and instead they continued to market the Rock 'n Play Sleeper as safe for overnight and prolonged infant sleep.

143.    The purpose of Defendants' concealment of the dangers was to prevent Plaintiff and other Class members from seeking redress.

144.    Plaintiff and the other Class members justifiably relied on Defendants to disclose the true nature of the products they purchased and/or owned because that defect was not discoverable by Plaintiff and the other Class members through reasonable efforts.

145.     Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**Discovery Rule Tolling**

146.     Plaintiff and other Class members, through the exercise of reasonable diligence, could not have discovered Defendants' wrongdoing prior to the Wall Street Journal's November 2018 article, which detailed the many deaths and injuries that occurred due to the use of inclined sleepers and revealed that Defendants were concealing and misrepresenting dangerous defects in the Rock 'n Play Sleeper and the risks that were posed by those defects.

147.     Plaintiff and the other Class members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable person to suspect, that Defendants knowingly failed to disclose material information within their knowledge about a dangerous defect to consumers worldwide.

148.     As such, no potentially relevant statute of limitations should be applied.

**Estoppel**

149.     Defendants were under a continuous duty to disclose to Plaintiff and the other members of the Class the facts that it knew about the dangerously defective design of the Rock 'n Play Sleeper.

150.     Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Rock 'n Play Sleeper from Plaintiff and other members of the Class.

151. Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

152.     Plaintiff brings this class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and on behalf of a nationwide class (the "Nationwide Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper from 2009 to the present.**

153.     Additionally, or alternatively, Plaintiff seeks certification of a Class of Oklahoma purchasers and/or owners (the "Oklahoma Class") defined as:

> **All persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in Oklahoma from 2009 to the present.**

154.     Excluded from the Nationwide Class and the Oklahoma Class (the "Class" hereinafter references the Nationwide and Oklahoma Classes collectively unless otherwise indicated) are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents and directors.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

155.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

156.     ***Numerosity—Federal Rule of Civil Procedure 23(a)(1).*** The members of the Class are so numerous that joinder of all Class members would be impracticable.  Defendants sold millions of Rock 'n Plays. Plaintiff is informed and believes, and on that basis alleges, that the Class contains many thousands of members. The precise number of Class members is unknown to Plaintiff.

157.     ***Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)***.  Common questions of law and fact exist as to all Class members and predominate over

questions affecting only individual Class members.  Such common questions of law or fact include, inter alia:

    a. Whether Defendants' claims about the Rock 'n Play Sleeper being suitable for prolonged or overnight sleep are reasonably likely to deceive.

    b. Whether Defendants engaged in unfair and/or deceptive advertising in marketing the product as a "Sleeper" that was suitable for prolonged or overnight sleep.

    c. Whether Defendants' misconduct constitutes a breach of the warranties that exists between Defendants and Plaintiff and the other members of the Class.

    d. Whether Defendants have been unjustly enriched.

    e. Whether Plaintiff and the members of the Class have been injured by Defendants' misconduct.

    f. Whether Plaintiff and the members of the Class are entitled to relief, and the amount and nature of such relief.

158.    Defendants engaged in a common course of conduct giving rise to the legal claims brought by Plaintiff, on behalf of herself and other Class members.  Similar or identical common law violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

159.    ***Typicality—Federal Rule of Civil Procedure 23(a)(3)***.  Plaintiff's claims are typical of the claims of the other members of the Class because, inter alia, all Class members were injured through the uniform misconduct described above, and all Class members were subject to Defendants' deceptive statements, including deceptive claims that accompanied each and every Rock 'n Play Sleeper that was sold concerning its suitability for prolonged or overnight sleep.

Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

160.     *Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)*. Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Class.

161.     *Superiority—Federal Rule of Civil Procedure 23(b)(3)*.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class members could afford individual litigation, economies of scale and comprehensive supervision by a single court strongly weigh in favor of resolution on a class basis.

### COUNT I
### Violation of Oklahoma Consumer Protection Act
### (15 O.S. §§ 751 et. al. )
### (On Behalf of Plaintiff and the Oklahoma Class)

162.     Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 161 above, as if fully set forth herein.

163.     This cause of action is brought pursuant to Oklahoma Consumer Protection Act, 15 O.S. §§ 751 et. al. ("OCPA"), which prohibits deceptive acts or practices in the conduct of any business in Oklahoma.

164.    OCPA § 761.1 provides that "… the aggrieved consumer shall have a private right of action for damages, including but not limited to, costs and attorney's fees."

165.    Defendants' design, manufacture, marketing, advertising, labeling, and/or sale of the Rock 'n Play Sleeper constitutes Defendants' "course of business."

166.    The Defendants' conduct alleged herein violates the OCPA in that Defendants engaged in the unfair acts and deceptive practices as described herein, which included marketing directed at Plaintiff and the Class, conveying, on the boxes containing the product and elsewhere, the message that the Rock 'n Play Sleeper is appropriate for overnight sleep and prolonged sleep, and the message that the use of Rock 'n Play Sleeper is known to be generally safe.  Defendants' marketing and sale of the product omitted adequate warnings concerning the danger of death and injury associated with the use of Rock 'n Play Sleepers.  Defendants' representations and omissions concerning the product were deceptive, false and misleading given the dangers of Rock 'n Play Sleepers described herein. Such conduct is inherently and materially deceptive and misleading in a material respect, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

167.    The materially misleading statements and deceptive acts and practices of Defendants alleged herein were directed at the public at large, in Oklahoma and across the United States.

168.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances.

169.    Defendants' violation of the OCPA was willful and knowing.  As described above, at all relevant times, Defendants, among other things, knew that their Rock 'n Play Sleepers had caused many infant deaths and injuries, and that the AAP, as well multiple other pediatric professionals and consumer groups, recommended they not be used as sleepers, and that certain

other countries had prohibited them from being sold as sleepers. Nonetheless, Defendants continued to sell the products in the United States advertising their use for overnight and prolonged sleep in order to increase their own profits.

170. As a result of Defendants' deceptive and misleading acts, Plaintiff and the members of the Class have been injured because they purchased and/or owned Rock 'n Play Sleepers based on Defendants' representations and without full disclosure of the material facts discussed above.

171. As a result of Defendants' conduct in violation of the OCPA, Plaintiff and the members of the Class have sustained damages in amounts to be proven at trial because if Defendants had disclosed the information discussed above about the Rock 'n Play Sleeper and otherwise been truthful about its safety, Plaintiff would not have purchased and/or received Defendants' product. Defendants were also able to charge more than what its Rock 'n Play Sleeper would have been worth had they disclosed the truth about it.

172. As a result, pursuant to the OCPA, Plaintiff and the Class are entitled to make claims against Defendant for actual damages to be determined at trial, but not less than fifty (50) dollars per Class member.

173. Additionally, pursuant to the OCPA, Plaintiff and the Class make claims for attorneys' fees, costs.

174. Plaintiff further demands punitive damages on her own behalf and behalf of the Class.

**COUNT II**
**Breach of Warranty**
**(On Behalf Plaintiff, the Nationwide Class, and Additionally or alternatively, the Oklahoma Class)**

175. Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 174 above, as if fully set forth herein.

176.    The Rock 'n Play Sleeper is a "good" as defined in Oklahoma's Commercial Code governing the implied warranty of merchantability.  12A O.S. § 2-105.

177.    Defendants are "merchants" and the Rock 'n Play Sleepers are "goods" as defined under the Oklahoma Commercial Code.

178.    Defendants created express and implied warranties that the Rock 'n Play Sleeper was in merchantable condition and of a merchantable quality.

179.    Defendants created express and implied warranties that the Rock 'n Play Sleeper was appropriate for the particular purposes for which Plaintiff and Class Members purchased and/or received them (i.e., safe for prolonged or overnight sleep, and generally safe).

180.    By placing the Rock 'n Play Sleeper in the stream of commerce, Defendants impliedly warranted that the Rock 'n Play Sleeper is reasonably safe, and that all claims in their advertising and marketing of the Rock 'n Play Sleeper were true, including that the Rock 'n Play Sleeper is safe and reliable.

181.    As a merchant, Defendants knew that consumers, including Plaintiff and the Class, relied upon Defendants to design, label, and sell products that were reasonably safe and not deceptively marketed, and in fact members of the public, including Plaintiff and the Class, reasonably relied upon the skill and judgment of Defendants and upon said express and implied warranties in purchasing the Rock 'n Play Sleeper.

182.    Defendants breached the express and implied warranties because a "sleeper," must provide a suitable and safe sleeping environment for prolonged periods or overnight, and the Rock 'n Play Sleepers do not.

183.    The Rock 'n Play Sleeper is dangerous in that it is of such a character that when used in its expected manner it is likely to be a source of potential death and injury to babies.

184.    Plaintiff and members of the Class are among those intended to be ultimate consumers of Rock 'n Play Sleepers.

185.    At all times that Defendants warranted and sold the Rock 'n Play Sleeper, they knew or should have known that its warranties were false, and yet they did not disclose the truth in a timely manner or stop manufacturing or selling the Rock 'n Play Sleeper, and instead continued to issue false warranties.  It is thus not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach.

186.    The Rock 'n Play Sleepers were defective when Defendants delivered the sleepers to their resellers, dealers, and distributors which sold the Rock 'n Play Sleeper, and the Rock 'n Play Sleepers were therefore still defective when sold to Plaintiff and the Class.

187.    Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers.  These intermediaries sell Rock 'n Play Sleepers to consumers and are not, themselves, consumers of Rock 'n Play Sleepers, and therefore have no rights against Defendants with respect to Plaintiff's and all other Class members' purchases of Rock 'n Play Sleepers.  Defendants' warranties were designed to influence consumers who purchased and/or owned Rock 'n Play Sleepers.

188.    As set forth further above, Defendants are on notice of its breaches of warranty. Defendants sent the recall notice to purchasers and lessors of the Rock 'n Play Sleeper, including the members of the Class, demonstrating that they knew the identities of consumers to whom they made the warranties.

189.    As a direct and proximate result of Defendants' breaches of warranties, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

**COUNT III**
**Negligence**
**(On Behalf Plaintiff, the Nationwide Class, and Additionally or alternatively, the Oklahoma Class)**

190.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 189 above, as if fully set forth herein.

191.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing, and marketing products for infant use.

192.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

193.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for their intended use.

194.    But for Defendants' breaches of their duties, Class members would not have purchased, owned, and/or continued to use the defective Rock 'n Play Sleepers or would not have paid as much for them as they did, and would not have exposed their infants to the risk of death or injury.

195.    Plaintiff and Class members were foreseeable victims of Defendants' wrongdoing. Defendants knew or should have known that their Rock 'n Play Sleepers would cause damages to Class members.  The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

196.    Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

**COUNT IV**
**Gross Negligence**
**(On Behalf Plaintiff, the Nationwide Class, and Additionally or Alternatively, the Oklahoma Class)**

197.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 196 above, as if fully set forth herein.

198.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in designing, manufacturing and marketing products for infant use.

199.    Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

200.    Defendants also owed a duty to disclose the material fact that Rock 'n Play Sleepers were defective and dangerous, and unfit and inherently unsafe for their intended use.

201.    Defendants knew or should have known that Plaintiff and other Class members were relying on them to manufacture, market and label the Rock 'n Play Sleepers with reasonable care, and that consumers reasonably and foreseeably relied on them to do so.

202.    Defendants grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Plaintiff and all members of the Class.  Defendants failed to exercise the degree of prudence, caution, and good business practice that would be expected of any entity selling products for infant use.  Although they knew that Rock 'n Play Sleepers could cause and had caused many infant deaths and injuries, and that the AAP as well multiple other pediatric professionals and consumer groups recommended it not be used as a sleeper, and that certain other countries had prohibited it from being sold as a sleeper, Defendants continued to sell the product in the United States for overnight and prolonged sleep.  Defendants knowingly allowed further tragedy to occur so that they could continue reaping profits.

203.    Defendants failed to exercise even slight or scant care and/or their conduct evinces a reckless disregard for the rights of others and/or is redolent of intentional wrongdoing.

204.    If Defendants had not been grossly negligent with respect to the manufacture, marketing, labeling and/or sale of the Rock 'n Play Sleepers, Plaintiff and other Class members would not have purchased and/or owned the Rock 'n Play Sleepers.

205.    As a direct and proximate result of Defendants' gross negligence with regard to the Rock 'n Play Sleepers, Plaintiff and the Class have been harmed.

**COUNT V**
**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.**
**(On Behalf Plaintiff, the Nationwide Class, and Additionally or alternatively, the Oklahoma Class)**

206.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 205 above, as if fully set forth herein.

207.    The sale of the Rock 'n Play Sleepers was subject to the provisions and regulations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.

208.    The Rock 'n Play Sleepers are "consumer products" as defined in the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

209.    Plaintiff and the other Nationwide Class members are "consumers" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

210.    Defendants are "suppliers" and "warrantors" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

211.    The Rock 'n Play Sleepers' implied warranties are covered by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

212.    Defendants breached these warranties, as further described above, by selling the Rock 'n Play Sleepers as "sleepers," not disclosing their defective condition, and by providing

Rock 'n Play Sleepers not in merchantable condition and not fit for the ordinary purpose for which baby sleepers are used. They are also not fit for the specific purposes for which Defendants sold them and for which Class members purchased and/or owned them.

213. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between Defendants and those who sell their products; specifically, they are the intended beneficiaries of Defendants' express and implied warranties. The vendors were not intended to be the ultimate consumers of the Rock 'n Play Sleepers and have no rights under the warranty agreements provided with the Rock 'n Play Sleepers; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because the Rock 'n Play Sleepers are dangerous instrumentalities due to the aforementioned defects and nonconformities.

214. Requiring an informal dispute settlement procedure or affording Defendants a reasonable opportunity to cure its breach of written warranties, is unnecessary and futile. Defendants knew, should have known, or were reckless in not knowing, of their misrepresentations concerning the Rock 'n Play Sleepers' inability to provide a safe sleeping environment, but nonetheless failed to rectify the situation and/or disclose the truth. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiff resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

215. Plaintiff and the other Class members have been damaged as a result of the wrongful conduct complained of herein. Said conduct continues and the harm or risk of harm is ongoing.

216.     The amount in controversy exceeds the statutory minimums set forth at 15 U.S.C. § 2310(d)(3).  Each Class member's individual claim is equal to or larger than $25 and the cumulative amount in controversy (excluding interest and costs) exceeds $50,000.

217.     As a result of Defendants' violations of the Magnuson-Moss Warranty Act and its express and implied warranties with consumers, Plaintiff and the other members of the Class have been damaged in an amount to be determined at trial.

## COUNT VI
## Unjust Enrichment
### (On Behalf of Plaintiff, the Nationwide Class and Additionally or Alternatively, the Oklahoma Class)

218.     Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 217 above, as if fully set forth herein.

219.     As a result of Defendants' material, deceptive advertising, marketing and/or sale of the Rock 'n Play Sleeper, Defendants were enriched at the expense of Plaintiff and all other Nationwide Class and Oklahoma Subclass members through their purchase of the Rock 'n Play Sleeper, because it does not provide the benefits as represented and exposes their children to greater and more serious risks than represented.

220.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Nationwide Class and Oklahoma Subclass as the result of their deceptive marketing and advertising practices.  Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiff and the National Class and Oklahoma Subclass.

## COUNT VII
## Fraud
### (On Behalf of Plaintiff, the Nationwide Class and Additionally or Alternatively, the Oklahoma Class)

221.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

222.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

223.    This claim is based on fraudulent representations and omissions concerning the safety of consumers who use the Sleepers. As discussed above, Defendants failed to disclose the risks associated with the intended use of the Sleeper, or that the risks were substantially likely to manifest through the customary and intended use of the Sleepers. Defendants also represented the Sleepers as safe for prolonged sleep, which they were not.

224. The false and misleading representations and omissions were made with knowledge of their falsehood. Defendants of medical guidelines and knew of consumer and other reports of the Sleepers' dangerous nature. Nonetheless, Defendants continued to sell their worthless and dangerous Sleepers to unsuspecting consumers.

225. The false and misleading representations and omissions were made by Defendants, upon which Plaintiff and members of the proposed Class reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the proposed Class and to purchase the Sleepers.

226. The fraudulent actions of Defendants caused damage to Plaintiff and members of the proposed Class, who are entitled to damages and other legal and equitable relief as a result.

**COUNT VII**
**Declaratory Judgment**
**(On Behalf of Plaintiff, the Nationwide Class and Additionally or Alternatively, the Oklahoma Class)**

227.    As a result of Defendants' misleading and fraudulent actions and omissions, Plaintiff and the Class are entitled to declaratory relief, as permitted by equity, including directing

Defendants to identify, with Court supervision, the victims of their misconduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by the Court to be unlawful, and ordering Defendants to engage in a corrective advertising campaign to place victims of their misconduct on notice of the availability of a full refund.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests relief against Defendants as set forth below:

1. Certifying the proposed Nationwide Class and Oklahoma Class;

2. Appointing Plaintiff as Class representative and her undersigned counsel as Class counsel;

3. Awarding Plaintiff and the proposed Class members damages;

4. Awarding punitive damages to the extent permitted under Oklahoma and other applicable law;

5. Awarding restitution and disgorgement of Defendants' revenues to Plaintiff and the proposed Class members;

6. Awarding declaratory relief as permitted by equity, including directing Defendants to identify, with Court supervision, the victims of their misconduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by the Court to be unlawful;

7. Ordering Defendants to modify the recall of all Rock 'n Play Sleepers sold in the United States to provide sufficient recompense to all Class members;

8. Ordering Defendants to engage in a corrective advertising campaign;

9. Awarding attorneys' fees and costs; and

10. Granting such additional relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all issues so triable.


Dated:  May 30, 2019

Respectfully submitted,


*/s/* Daniel E. Smolen

Daniel E. Smolen, OBA No. 19944
Lauren Lambright, OBA No. 22300
Smolen & Roytman
701 S. Cincinnati Ave.
Tulsa, OK 74119
(918) 585-2267 (telephone)
(918) 585-2669 (fax)
danielsmolen@ssrok.com
laurenlambright@ssrok.com


Dennis A. Caruso, OBA No. 11786
Mark A. Smith, OBA No. 31231
Caruso Law Firm, P.C.
1325 East Fifteenth Street, Suite 201
Tulsa, Oklahoma 74120
(918) 583-5900 (telephone)
(918) 583-5902 (fax)
dcaruso@carusolawfirm.com
msmith@carusolawfirm.com

*Attorneys for Plaintiffs*